FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 13 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
DANIEL MAHER, et al.,

                         Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

                         Defendants.
------------------------------------------------------------ x

**MEMORANDUM & ORDER**

09-CV-2679 (ENV)(JO)

**VITALIANO, D.J.**

Plaintiff Daniel Maher ("Maher") and his wife, Heather Maher, filed this action against the City of New York and its Department of Education (collectively the "City"), the New York School Construction Authority ("SCA"), and T.A. Ahern Contracting Corp. ("Ahern"), alleging that defendants unlawfully and negligently caused Maher—an iron worker at a city-owned construction site—to fall from a scaffold and sustain serious injuries.[1] On July 23, 2010, all parties moved for summary judgment on the issue of liability on two of the plaintiffs' claims. On March 18, 2010, this Court referred the motions to Magistrate Judge Orenstein for a report and recommendation. On January 10, 2011, Judge Orenstein issued his Report and Recommendation ("R&R") that plaintiffs' motion be denied and that defendants' motion be granted in part and denied in part. Plaintiffs have now filed timely objections to the R&R. For the reasons set forth below, the Court adopts the R&R in its entirety.

I. **BACKGROUND**

---

[1] Plaintiffs also named the New York City Board of Education as a defendant, though defendants claim that the Board did not exist at the time of Maher's injury. (Tr. at 87:7-11, Oct. 27, 2010). The dynamic nature of school governance in New York City leaves open the question of which entity is in charge of the New York City school district at a given time. If the parties fail to resolve this issue consensually, the Court will resolve the matter at trial.

1

The events giving rise to plaintiffs' claims occurred on November 19, 2008 at New Utrecht High School in Brooklyn. As all parties agree, the City, acting through the SCA, had contracted with Ahern to construct an addition to the school. Ahern entered into a subcontract with nonparty Feinstein Iron Works, which in turn hired nonparty Glasmar Steel Erectors ("Glasmar") to erect the steel framing for the addition. Glasmar, whose president and partial owner is Maher's father, employed Maher as a steel connector on the project.

On the day of the incident, Maher was tasked with connecting beams to the building's skeletal frame. As all parties also agree, throughout the day Maher was wearing a safety harness with a six-foot lanyard, as required when working at an elevated height. At some point during the day, after connecting beams on the first floor of the building frame, he climbed a ladder provided by Glasmar to get to the second floor to connect another beam. According to both plaintiff and the only other witness to the incident, crane operator Mark Jones, Maher was "tied off" to the second level steel beam—that is, his lanyard was attached to a safety line running along the beam—while working on the second level of the building.

After completing this task, Maher attempted to install a steel diagonal brace and gusset—a pentagonal-shaped plate—to the intersection of a vertical beam running the height of the building and a horizontal beam on the building's second level. According to Maher, he could not install the lower bolts on the gusset plate from the second level horizontal beam because the connection points were beyond his reach. Consequently, he detached his lanyard from the safety line, climbed down a ladder to the first level, and, after walking along the first-level horizontal beam, shimmied up a vertical column to the bottom of the gusset plate that he was attempting to install.

The parties disagree as to whether or not a safety line was accessible to Maher at this

point. Plaintiffs allege that from Maher's position on the vertical column, the safety line was out of reach, so that he could not be tied off while installing the gusset plate. Defendants, by contrast, claim that Maher could have tied himself off to the safety line, but simply failed to do so. In either case, while attempting to secure the plate, Maher lost his footing and fell 22 to 23 feet to the ground. As a result of the long fall, he suffered multiple injuries, including fractured vertebrae and ribs and a punctured lung.

This suit followed. Plaintiffs filed their initial complaint on June 24, 2009, and amended their pleading on July 6, 2009, alleging that defendants unlawfully and negligently caused Maher to fall from an elevated workplace and sustain serious injury. Specifically, plaintiffs claim that defendants violated (i) the New York common-law duty of an owner or general contractor to maintain a safe construction site; (ii) New York Labor Law § 200, which codifies this common-law duty and establishes an employer's general duty to protect the health and safety of employees;[2] (ii) § 240(1), which requires all contractors, building owners, and their agents to furnish appropriate safety devices during the construction of a building for the protection of individuals employed in the construction work; and (iii) § 241(6), which requires all contractors, building owners and their agents to manage areas in which construction work is being performed so as to provide reasonable and adequate protection to individuals lawfully on site, including individuals employed in the construction work. In addition to these claims, Maher's wife pled her own claim for loss of consortium.

All parties have moved for summary judgment on the issue of liability on plaintiffs' common-law negligence and New York Labor Law claims. The dueling summary judgment motions were referred to Judge Orenstein. On January 10, 2011, Judge Orenstein issued his

---

[2] For this reason, and as discussed in greater detail below, plaintiffs' common-law negligence claim is coextensive with the statutory claim under Labor Law § 200.

R&R recommending that plaintiffs' motion for summary judgment be denied and defendants' motion be granted in part and denied in part. With respect to plaintiffs' § 200 and common-law negligence claims, the R&R recommended a finding that plaintiffs could not make the required threshold showing that defendants had authority to supervise or control the workplace. Thus, plaintiffs' argument that defendants violated the law by applying federal safety standards instead of enforcing the more stringent New York Labor Law requirements was rendered moot. With respect to plaintiffs' § 240(1) claim, the R&R recommended that the question of whether defendants had or had not provided adequate safety devices, including an accessible safety line, for Maher's use created a genuine issue of material fact that precluded summary judgment. By the same token, with respect to plaintiffs' § 241(6) claim, the R&R recommended that the question of whether Maher was adequately protected while working on site, via the provision of an accessible safety line and other protective measures, also created a genuine issue of material fact precluding summary disposition.

Plaintiffs made timely objection to the R&R.

## II. DISCUSSION

### A. Standard of Review

In the event, as here, that a party objects to the report and recommendation of a magistrate judge, 28 U.S.C. § 636(b)(1) provides for "a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." In making this determination, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). A *de novo* determination does not require a *de novo* hearing, *see United States v. Raddatz*, 447 U.S. 667, 674, 100 S. Ct. 2406 (1980); *Bristol-Myers Squibb Co. v.*

*McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1045 (2d Cir. 1992), but the court retains the discretion to receive further evidence beyond that presented to the magistrate judge, 28 U.S.C. § 636(b)(1)(C); *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998); *Morris v. Amalgamated Lithographers of Am.*, 994 F. Supp. 161, 163 (S.D.N.Y. 1998).

Accordingly, this Court applies the same standard in evaluating the parties' motions for summary judgment as if reviewing them in the first instance. Summary judgment is required where "there is no genuine issue as to any material fact," such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). In assessing a summary judgment motion, "the court cannot try issues of fact but can only determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation marks omitted). The moving party bears the burden of demonstrating that there are no such issues as to any material fact, *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion, *see Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Indeed, if the evidence favoring

the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

B. **Section 200 and Common Law Negligence**

Plaintiffs first object to Judge Orenstein's recommendation that their § 200 and common-law claims be dismissed for failing to make the threshold showing that defendants had the requisite supervisory control over the construction site to be held liable for Maher's injuries. The Court agrees with the R&R, however, that plaintiffs have failed to make the requisite showing as a matter of law.

As noted above, § 200 establishes an employer's general duty to protect the health and safety of employees and codifies the common-law duty of an owner or general contractor to maintain a safe construction site; the elements of the plaintiffs' claims under both the statute and common law are the same. *See Rizzuto v. L.A. Wenger Contracting Co., Inc.*, 693 N.E.2d 1068, 1073 (N.Y. 1998); *Ross v. Curtis Palmer Hydro-Elec. Co.*, 618 N.E.2d 82, 88 (N.Y. 1993). Under both § 200 and common law, where injuries arise "out of alleged defects or dangers in the methods or materials of the work," building owners and general contractors may be liable only if they had the authority to supervise and control the work actually being performed. *LaGuidice v. Sleepy's Inc.*, 890 N.Y.S.2d 564, 567-68 (2d Dep't 2009); *see also Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 301 (2d Cir. 2009) ("Under the 'supervision and control' wording of § 200, liability attaches only where the general contractor 'controlled the manner in which the plaintiff performed his or her work, *i.e.*, how the injury-producing work was performed.'") (quoting *Hughes v. Tishman Constr. Corp.*, 836 N.Y.S.2d 86, 89 (1st Dep't 2007)). Retention of general supervisory control, by contrast, is insufficient to establish the necessary authority for liability to attach under § 200. *Lamela v. City of New York*, 560 F. Supp. 2d 214, 221 (E.D.N.Y. 2008);

*accord Perri v. Gilbert Johnson Enters., Ltd.*, 790 N.Y.S.2d 25, 29 (2d Dep't 2005) (noting that "[g]eneral supervisory authority at a worksite for the purpose of overseeing the progress of the work and inspecting the work product is insufficient to impose liability"). Similarly, and significantly for this case, the authority to enforce general safety standards, oversee the performance of work, inspect the work site, or to stop work for safety reasons is insufficient under § 200. *See Lamela*, 560 F. Supp. 2d at 221; *McCormick v. 257 W. Genesee, LLC*, 913 N.Y.S.2d 435, 437 (4th Dep't 2010) ("[A] general duty to ensure compliance with safety regulations or the authority to stop work for safety reasons is insufficient to raise a triable issue of fact" on a § 200 claim) (citing *Verel v. Ferguson Elec. Constr. Co., Inc.*, 838 N.Y.S.2d 280, 283 (4th Dep't 2007)); *Shelley v. Flow Intern. Corp.*, 724 N.Y.S.2d 244, 245 (4th Dep't 2001) ("The contractual duty to oversee the performance of work, inspect the work site and ensure compliance with safety regulations does not constitute supervision and control over the subcontractor's methods of work.") (internal quotations omitted).

Plaintiffs agree with this summary of the law, as laid out clearly in the R&R, but argue that Judge Orenstein nonetheless erred in overlooking the fact that defendants played an active role at the work site, such that liability is appropriate under § 200. Plaintiffs allege that defendants had officers permanently assigned to the job site responsible for safety conditions: for example, SCA had three project officers on site—whose duty, according to plaintiffs, was to walk the job site, look for unsafe practices or conditions, and take action if they saw any, either by reporting the problem or stopping work in the event of an immediate danger to life or health—and two or more managing safety officers who also made regular inspections. However, even accepting these factual assertions as to the safety officers' presence and their safety responsibilities as true and drawing all reasonable inferences from these assertions, plaintiffs

7

have demonstrated only that defendants had general supervisory authority over the construction site, including the authority to inspect the work site and stop work if required for safety reasons. As courts have repeatedly held, this level of authority is not enough to establish liability under § 200. *See, e.g., Lamela,* 560 F. Supp. 2d at 221; *McCormick,* 913 N.Y.S.2d at 437; *Verel,* 838 N.Y.S.2d at 283; *Shelley,* 724 N.Y.S.2d at 245; *accord Reis v. Vannatta Realty,* 515 F. Supp. 2d 441, 446 (S.D.N.Y. 2007); *Wojcik v. 42nd St. Dev. Project,* 386 F. Supp. 2d 442, 456 (S.D.N.Y. 2005). That this is the case is placed in sharp relief by the role played by Maher's nonparty employer, Glasmar, which, as Maher testified at his deposition, provided all safety instructions, tools, and equipment for his work on the project. By contrast, as he conceded at his deposition, he received no safety instructions from anyone at SCA or Ahern.

Plaintiffs also allege that defendants had the authority to set—and not simply enforce—the safety standards at the worksite, and, in fact, created an unsafe workplace by requiring employees to comply only with federal Occupational Safety & Health Administration ("OSHA") requirements, instead of the more stringent requirements set out under New York Labor Law. Yet, even accepting as true the fact that defendants were in charge of setting the applicable safety standards, this level of control still falls short of the level required for liability under § 200. *See, e.g., Bonocore v. Vornado Realty Trust,* No. 05 Civ. 6422, 2009 WL 691933 (S.D.N.Y. Mar. 13, 2009). As defendants allegedly did here, the *Bonocore* defendants applied the less stringent OSHA safety standards at their worksite, requiring fall protection systems only for work taking place at an elevation of six feet or greater. *Id.* at *1. Notwithstanding their authority to set and enforce the on-site safety standard—as well as their regular presence at the site in order to ensure compliance with that standard plus their authority to stop work if a violation was observed—the court held that those defendants did not possess the requisite supervisory control for liability

under § 200 and granted their summary judgment motion. *Id.* at *5. Likewise, absent any showing that defendants supervised or controlled Maher's work on the project, their authority to set the applicable safety standard is insufficient to render them liable under § 200. Due to its congruency with the § 200 claim, the common law negligence claim falls as well.

For these reasons, the Court holds that the R&R correctly determined that defendants' motion for summary judgment as to their liability under § 200 and New York common law should be granted.

C. **Section 240(1) Claim**

Plaintiffs next object that Judge Orenstein erred in holding that genuine issues of material fact as to whether appropriate safety devices were available precluded summary judgment with respect to plaintiffs' § 240(1) claim. Again, the Court agrees with the R&R.

New York Labor Law § 240(1) requires contractors, building owners, and their agents to provide adequate safety devices to those workers subjected to elevation-related risks. *Wilson v. City of N.Y.*, 89 F.3d 32, 36 (2d Cir. 1996). The statute, commonly referred to as the "scaffold law," provides:

> All contractors and owners and their agents . . . in the erection . . . of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Lab. L. § 240(1). In order to prevail on a § 240(1) claim, plaintiffs must show (1) that defendants failed to provide the protection required by the statute, and (2) that such failure was the proximate cause of the accident. *Fernandez v. CMB Contracting*, 487 F. Supp. 2d 281, 286 (E.D.N.Y. 2007); *Shannon v. Lake Grover Ctrs., Inc.*, 118 F. Supp. 2d 343, 347 (E.D.N.Y. 2000). If plaintiffs can establish their prima facie case under the scaffold law, a showing of mere

contributory negligence cannot defeat their claim. *Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc.*, 803 N.E.2d 757, 761 (N.Y. 2003); *Zimmer v. Chemung Cnty. Performing Arts, Inc.*, 482 N.E.2d 898, 899 (N.Y. 1985). Rather, in that instance, defendants may avoid liability only by showing that Maher's actions were the "sole proximate cause" of his own injuries. *Blake*, 803 N.E.2d at 763. By the same token, however, if plaintiffs can establish their prima facie case, their summary judgment motion still may "not be granted 'where a reasonable jury could . . . conclude[] that [Maher's] actions were the sole proximate cause of his injuries.'" *Rodriguez v. Biltoria Realty, LLC*, 250 F. Supp. 2d 122, 128 (E.D.N.Y. 2003) (quoting *Weininger v. Hagedorn & Co.*, 695 N.E.2d 709, 710 (N.Y. 1998)).

In recommending that both parties' motions for summary judgment with respect to the § 240(1) claim be denied, Judge Orenstein found that genuine issues of material fact exist as to whether appropriate safety devices were available to Maher, including whether a safety line was accessible while he was working on the gusset plate. As the R&R notes, the parties agree that Maher was working at elevation and that, consequently, defendants were required to provide an adequate safety device. They also agree that at and prior to the time Maher was injured, Glasmar had installed safety lines running along the beams on the second level of the structure, and that, while Maher was wearing a safety harness with a six-foot lanyard at the time of his fall, he did not use the lanyard to tie off to the safety line when attempting to secure the gusset plate. The parties disagree, critically, as to whether Maher could reach this safety line while attempting to install the gusset plate. Judge Orenstein held that the conflicting record evidence on this question precluded summary judgment. On the one hand, Maher testified at his deposition that he could not have reached the safety line because he was at least four or five feet below the beam; this testimony was corroborated by the only witness to the accident, crane operator Mark Jones, who testified at his deposition that it would not have been possible for Maher to tie off to the safety line

on the beam above him. On the other hand, however, Jones also estimated that Maher was, at most, only two feet below the beam at the time of his fall. If this estimate is correct, Judge Orenstein reasoned, the safety line could have been accessible to Maher, since, according to the record evidence, his arms are 25 inches long.

Plaintiffs argue on review that Judge Orenstein's reasoning, as well as the factual finding on which it was based, were erroneous. According to plaintiffs, although Judge Orenstein understood Jones to be testifying that Maher had been two feet below the horizontal beam and the safety line when he fell, Jones in fact testified that Maher was two feet below "the connection"—that is, the gusset plate, the bottom of which was several feet below the beam, putting the safety line well out of reach. In support of this interpretation, plaintiffs have submitted a post-motion sworn affidavit from Jones, confirming that the operative distance of two feet was between Maher and "the connection," not the horizontal beam or the safety line, and stating that this testimony is consistent with the statements he gave at his deposition.

Still, upon review of the record evidence, it is difficult to square Jones's sworn affidavit with his sworn deposition testimony. During the deposition, Jones described Maher's position as being two feet or less from the horizontal beam on multiple occasions. For example, at one point, defendants' counsel directed his attention "to the horizontal beam going across and a wire that's going from one end towards the other end":

| | |
|---|---|
| Defs: | Is that the safety line or what you've been talking about as the safety line? |
| Jones: | Yes, that's the safety cable. |
| . . . | |
| Defs: | How many feet below the horizontal line, approximately, was Mr. Maher at the time of his accident? |
| Jones: | At the actual connection where he was working on? |

11

| | |
|---|---|
| Defs: | Yes. |
| Jones: | Maybe two feet. |

(Dep. of Mark Jones 106.) Similarly, over the objections of plaintiffs' counsel, Jones again testified later in the deposition that Maher was within two feet of the horizontal beam:

| | |
|---|---|
| Defs: | As Mr. Maher was positioned on the column, approximately, two feet down from the horizontal beam— |
| Pls: | I object to that. |
| Defs: | That's his testimony. |
| Pls: | No. From the connection he was trying to make. |
| Defs: | How far from the beam was Mr. Maher? |
| Jones: | How far down was he? |
| Defs: | How far from the horizontal beam was Mr. Maher positioned? |
| Jones: | I don't know, a foot or so. |
| | . . . |
| Defs: | So from his head to the horizontal beam how far would that be? |
| Jones: | A foot. |

(*Id.* at 111.) And again, shortly later:

| | |
|---|---|
| Defs: | [L]et the record reflect that Mr. Jones marked with a star the area in which he observed Mr. Maher located at the time of his accident prior to his accident. |
| Defs: | Approximately, how far from the horizontal beam would you say that is? |
| Jones: | I don't know. |
| Defs: | Is that two feet, three feet, one foot, approximately? |
| Jones: | Where his body was? |
| Defs: | Yes, in relation to the beam. |

12

Jones: I would say a foot, two feet.

(*Id.* at 112-13.) In other words, contrary to plaintiffs' contention that Judge Orenstein "created a question of fact out of a misrepresentation of one word in Jones's deposition," (Pls. Objections to R&R, Doc. 63, at 13), Jones indicated repeatedly—even though steadfastly maintaining that Maher could not reach the safety line—that Maher's position was at most two feet below the horizontal beam.

Based on the totality of these conflicting statements, the Court agrees with the R&R that a material question of fact exists as to whether the safety line was, in fact, accessible to Maher. This conclusion is compelled despite Jones's subsequent affidavit. Unquestionably, the Court retains the discretion to receive further evidence beyond that presented to the magistrate judge, 28 U.S.C. § 636(b)(1)(C); *Hynes*, 143 F.3d at 656; *Morris*, 994 F. Supp. at 163, but Jones's epiphany by affidavit does not extinguish the question of fact raised by his deposition testimony. Rather, resolving the ambiguities in Jones's testimony in favor of defendants, as this Court is obliged to do, *see Sec. Ins. Co. of Hartford*, 391 F.3d at 83; *Gummo*, 75 F.3d at 107, precludes summary judgment in plaintiffs' favor as to the § 240(1) claim. Indeed, the ambiguities themselves, and their bearing on Jones's credibility, are a matter properly reserved for the finder of fact.

Moreover, the question of the safety line's accessibility aside, material questions of fact also exist as to the availability and adequacy of other safety devices. For example, defendants argue that Maher could have used the very ladder he used to climb down from the second level to the first level just prior to his accident or, alternatively, any of the other ladders that were present at the worksite. While plaintiffs argue that, at the time of the accident, all the ladders were either in use or would require a crane to be moved, this is a question that must be submitted to the

13

finder of fact. So, too, should the question of whether a ladder, if accessible, would have sufficed to protect Maher from his fall and resulting injury, a question on which the parties have offered conflicting expert testimony, (*compare* Giuliano Aff. ¶ 11 (testifying that a ladder would not have offered adequate protection) *with* Ross Aff. 2-3 (testifying that a ladder would have offered adequate protection), and on which a fact-finder might conceivably find for either plaintiffs or defendants, *cf. Caputo v. PNC Bank*, 384 F. Supp. 2d 685, 687 (S.D.N.Y. 2005) (holding that accessible ladder was an adequate safety device); *McCarthy v. Turner Constr., Inc.*, 859 N.Y.S.2d 648, 649 (1st Dep't 2008) (affirming summary judgment in plaintiff's favor where unsecured ladder tipped over, causing plaintiff's fall). Similarly, there are material questions of fact as to whether a "beam buddy" (a device with a D-shaped ring that can be attached to a beam and, in turn, to a worker's harness and lanyard) was available to Maher at the time of the accident, (*see* Maher Dep. I at 68 (discussing availability of beam buddy); Maher Dep. II at 24-25 (same)), and whether such a device would have afforded him proper protection, (*compare* Gerald Maher Dep. at 145 (stating that the only way Maher could have used a beam buddy was to free both hands while climbing, thereby putting himself in further jeopardy) *with* Gerald Maher Dep. at 120-21 (stating, when asked what device could have prevented a worker's fall from a vertical column at the jobsite, "[T]he only thing he could have used was a beam buddy"). Finally, a fact-finder might reasonably infer that record evidence indicating that both a boom lift and a scissor lift were available at the worksite prior to Maher's injury (Michaelides Aff. ¶¶ 7, 8) suggests that the lifts remained available to Maher at the time of his injury.

It is evident, then, that plaintiffs' have not established as a matter of law that defendants violated § 240(1) by failing to provide adequate safety devices.

Nonetheless, plaintiffs argue that even if any of these devices were available, they remain

entitled to summary judgment because defendants cannot show that Maher's negligence was the sole proximate cause of his fall. The Court disagrees. Again, summary judgment may not be granted where a reasonable jury could conclude that Maher's actions were the sole proximate cause of his injuries. *Rodriguez*, 250 F. Supp. 2d at 128. According to the New York Court of Appeals, three elements are required to reach a sole proximate cause conclusion: (1) that safety devices were readily available at the work site; (2) that plaintiff knew he was expected to use them; and (3) that for no good reason he chose not to do so. *See Gallagher v. N.Y. Post*, 923 N.E.2d 1120, 1122-23 (N.Y. 2010). As discussed earlier, material questions of fact exist as to whether appropriate safety devices were readily available at the work site. Moreover, defendants have pointed to ample evidence in the record to create a genuine factual dispute as to whether or not plaintiff knew he was expected to use the devices, but failed to do so for no evident good reason. As Maher testified at his deposition, he has been employed in the construction business for over 20 years, during which time he has been required to take numerous safety-training courses, including instruction on necessary precautions when working at elevation; indeed, he has even conducted safety meetings at which fall protection devices were discussed. (Maher Dep. 17-18, 20-23, 35.) On the day of the incident, he was wearing a safety harness with a lanyard, yet he failed to tie-off, despite Gerald Maher's persistent warnings to do so. (Gerald Maher Dep. 37.) Taking into account Maher's significant experience and training, as well as the cautions he received while working at the jobsite, a reasonable fact-finder could certainly conclude that Maher's own actions were the sole proximate cause of his injury.

For these reasons, the Court agrees with the R&R that plaintiffs' summary judgment motion as to their § 240(1) claim must be denied, as Judge Orenstein recommended.

**D.**     **Section 241(6) Claim**

Finally, plaintiffs object that Judge Orenstein erred in holding that genuine issues of material fact as to whether defendants failed to ensure that workers using safety harnesses anchor them to an appropriate line precluded summary judgment with respect to plaintiffs' § 241(6) claim. Once again, as to this claim too, the Court agrees with the R&R.

Section 241(6) of the New York Labor Law "imposes a broadly stated obligation to ensure that work sites are 'so constructed . . . operated and conducted as to provide reasonable and adequate protection and safety' for workers." *Shannon v. Lake Grove Ctrs., Inc.*, 118 F. Supp. 2d 343, 349 (E.D.N.Y. 2000) (quoting N.Y. Lab. Law § 241(6)). "Because Section 241(6) does not set forth particular standards that must be followed, the court must reference outside sources to determine the standard by which the defendant's conduct is to be measured." *Id.* at 349. Accordingly, as a necessary, but not sufficient condition, to prevail on a § 241(6) claim, plaintiffs must show that defendants violated a specific regulation contained in the New York Industrial Code. *See id.*; *Rizzuto*, 693 N.E.2d at 1071; *Ross v. Curtis-Palmer Hydro-electric Co.*, 618 N.E.2d 82, 86 (N.Y. 1993). As the parties agree, the only such regulation at issue here provides that "[a]t all times during use [an] approved safety belt or harness shall be properly attached either to a securely anchored tail line, directly to a securely anchored hanging lifeline or to a tail line attached to a securely anchored hanging lifeline." N.Y. Comp. Codes R. & Regs, tit. 12, § 23-1.16(b).

In recommending that both parties' summary judgment motions be denied, Judge Orenstein held that there were genuine issues of material fact as to whether the safety line to which Maher might have anchored his harness was accessible and, even were it inaccessible, as to whether defendants nonetheless had constructed, operated and conducted the jobsite as to provide reasonable and adequate protection and safety, as required by § 241(6). Plaintiffs'

instant argument is but a refrain that Judge Orenstein's recommendation is in error because, although Maher was provided with a harness, the record evidence establishes as a matter of law that the safety line was not positioned within his reach. As already discussed, however, the Court agrees that there is a genuine issue as to whether or not plaintiff was within reach of the safety line. Moreover, given the open questions as to whether other safety devices were accessible to Maher, the Court also agrees that there is a genuine issue as to whether defendants provided "reasonable and adequate protection and safety" on the worksite, even if the line was out of reach. In sum, the Court agrees that summary judgment is not warranted either way as to plaintiffs' § 241(6) claim.

### III. CONCLUSION

For the reasons set forth above, plaintiffs' objections are overruled and the R&R is adopted in full as the opinion of the Court.

The parties are directed to arrange a conference with Judge Orenstein to complete all pretrial matters and ready for trial.

**SO ORDERED.**

Dated: Brooklyn, New York
January 6, 2012

s/ ENV

ERIC N. VITALIANO
United States District Judge